NB:CNC
F#2010R00447

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ANGEL CORDERO, JR.,
    also known as "King Epic,"
JOSE SOSA,
    also known as "King Sosa,"
JEREMIAH BOWENS,
    also known as "King Ghost,"
LUIS LEMUS,
    also known as "King Scar,"
JONATHAN DIAZ,
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

SCAL MAZARA,
    also known as "King Puppet"
    or "Pup,"
EDWIN MOREJON,
    also known as
   "King Drama," and
JENNIFER SABATINO,

              Defendants.

- - - - - - - - - - - - - - - -X

**10-0317M**

**FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANTS _____

(T. 18, U.S.C., §§ 2,
373(a), 922(a)(1)(A),
924(a)(1)(d), 922(g)(1),
922(k), 1959(a)(3) and
1959(a)(6))

EASTERN DISTRICT OF NEW YORK, SS:

        JOHN M. TRIOLO, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between
February 2009 and March 24, 2010, both dates being approximate
and inclusive, within the Eastern District of New York, the
defendants ANGEL CORDERO, JR., also known as "King Epic," JOSE

SOSA, also known as "King Sosa," JEREMIAH BOWENS, also known as "King Ghost," LUIS LEMUS, also known as "King Scar," JONATHAN DIAZ ████████████████████████████████ for the purpose of gaining entrance to, maintaining and increasing their position in an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to commit assault with dangerous weapons.

(Title 18, United States Code, Sections 1959(a)(6)).

Upon information and belief, on or about and between February 20, 2009 and December 22, 2009, both dates being approximate and inclusive, within the Eastern District of New York, the defendants JOSE SOSA, also known as "King Sosa," JEREMIAH BOWENS, also known as "King Ghost," LUIS LEMUS, also known as "King Scar," JONATHAN DIAZ, ████████████████ ████████████ together with others, for the purpose of gaining entrance to, maintaining and increasing their position in an enterprise engaged in racketeering activity, did knowingly and intentionally commit assaults with dangerous weapons.

(Title 18, United States Code, Sections 1959(a)(3)).

Upon information and belief, in or about and between February 2009 and March 24, 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant ANGEL CORDERO, JR., also known as "King Epic," did knowingly and intentionally solicit, command, induce and

otherwise endeavor to persuade another person to engage in conduct constituting a felony that has as an element the use and attempted use of physical force against the person of another in violation of the laws of the United States, to wit: assaults with dangerous weapons, in violation of 18 U.S.C. § 1959(a), with the intent that such other person engage in such conduct and under circumstances strongly corroborative of that intent.

(Title 18, United States Code, Section 373(a))

Upon information and belief, on or about and between September 9, 2009 and October 1, 2009, both dates being approximate and inclusive, within the Eastern District of New York, the defendants ANGEL CORDERO, JR., also known as "King Epic," JEREMIAH BOWENS, also known as "King Ghost," JOSE SOSA, also known as "King Sosa," and JENNIFER SABATINO, together with others, not being licensed importers, licensed manufacturers or licensed dealers in firearms, did knowingly and willfully engage in the business of dealing in firearms.

(Title 18, United States Code, Section 922(a)(1)(A) and 924(a)(1)(d))

Upon information and belief, on or about October 1, 2009, within the Eastern District of New York, the defendant ANGEL CORDERO, JR., also known as "King Epic," did knowingly and intentionally possess a firearm, to wit: a .380 caliber semi-automatic Bersa Thunder pistol, which firearm had the

manufacturer's serial number removed, obliterated, and altered, and which had been shipped and transported in interstate commerce.

(Title 18, United States Code, Section 922(k))

Upon information and belief, on or about December 10, 2009, within the Eastern District of New York, the defendant EDWIN MOREJON, also known as "King Drama," did knowingly and intentionally possess a firearm, to wit: a 9mm semi-automatic Smith & Wesson model 5906 pistol, which firearm had the manufacturer's serial number removed, obliterated, and altered, and which had been shipped and transported in interstate commerce.

(Title 18, United States Code, Section 922(k))

On or about March 21, 2010, within the Eastern District of New York, the defendant SCAL MAZARA, also known as "King Puppet" and "Pup," having previously been convicted in a court of a crime punishable by a term of imprisonment exceeding one year, did knowingly and intentionally possess in and affecting commerce a firearm, to wit: a 9mm Hi Point, model C9, semi-automatic pistol, bearing serial no. P148559.

(Title 18, United States Code, Sections 922(g)(1))

The source of your deponent's information and the grounds for his belief are as follows:[1/]

## A.   Qualifications and Sources

1.   I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over nineteen years.  Since 2006, I have been assigned to the FBI Long Island Gang Task (the "Task Force"), a task force comprised of law enforcement agents and officers from the FBI, the New York State Police, the Nassau County Police Department, the Nassau County Sheriff's Office, the Suffolk County Police Department, and the Hempstead Police Department.  The primary mission of the Task Force is to combat violent crime perpetrated by street gang members.

2.   The facts set forth in this affidavit are based on my personal knowledge and observations, my discussions with other law enforcement officers, my review of reports of other law enforcement officers, information provided by a confidential source ("CS"), my review of documents, audio recordings, video recordings and photographs related to this investigation, and my training and experience.

3.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they

---

[1/]   Because the purpose of this affidavit is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware.

are reported in sum and substance and in part, except where otherwise indicated.

## B.   The Almighty Latin King and Queen Nation

4.   Many of the cases investigated by the Task Force involve members of the street gang The Almighty Latin King and Queen Nation (hereinafter "the Latin Kings"). The defendants ANGEL CORDERO, JR., also known as "King Epic," JOSE SOSA, also known as "King Sosa," JEREMIAH BOWENS, also known as "King Ghost," LUIS LEMUS, also known as "King Scar," EDWIN MOREJON, also known as "King Drama," and SCAL MAZARA, also known as "King Puppet" and "Pup," are each self-admitted members of the Latin Kings. ███████████████████████████████████ ███████████████████████████████████ The Latin Kings constitutes an "enterprise" as defined in Section 1959(b)(2) of Title 18, United States Code, that is, a group of individuals associated in fact that engage in, and the activities of which affect, interstate and foreign commerce.   Furthermore, the Latin Kings, through its members and associates, engages in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts and threats involving robbery, in violation of the laws of the State of New York, and narcotics trafficking, in violation of 21 U.S.C. §§ 841 and 846.

5.   The Latin Kings is a Chicago-based violent street gang comprised of mainly Spanish speaking or Hispanic members. Latin Kings chapters, "tribes" and "divisions" have been established throughout the United States, including on Long Island.  On Long Island, Latin Kings divisions have been established in various towns, including Huntington, Hempstead, Freeport and Brentwood.  Following induction, members of the Latin Kings sometimes signify their membership with tattoos reading "ALKQN" or "ADR" or depicting a five-pointed crown, and by wearing the colors black and gold.  Moreover, members of the Latin Kings have special hand signals and salutes.  They also have sayings, such as "Amor de Rey" or "ADR" (meaning King Love), which proclaims their allegiance to the Latin Kings.  The number five (5) is important to the Latin Kings and is used in Latin Kings symbols, such as the five-pointed star and the crown with five points.

6.   The Latin Kings have a constitution and by-laws, which set out, among other things, the principles and structure of the Latin Kings.  Five men run each Latin Kings division.  The First Crown is the leader of the division; the Second Crown acts as an advisor to the First Crown; the Third Crown is the "Warlord" and is in charge of enforcing the ALKQN rules; the Fourth Crown is the Treasurer and is responsible for collecting dues from members; and the Fifth Crown is responsible for, among

other things, maintaining membership records.  In addition to the Five Crowns of each Latin Kings division, larger regional areas are led by Five Crowns.

7.   The division routinely holds meetings to plan criminal activity, and members pay dues into a division treasury, referred to as "the box" or "caja" (which means box in Spanish). The treasury funds are used for, among other things, to purchase firearms and ammunition, to promote other illegal activity, and to assist members who have been arrested.  Inter-division meetings, called "Universals," are used to coordinate criminal activities among different divisions.  Participation in criminal activity by a member or probationary member, especially violence directed at rival gangs, increases the respect accorded to that individual and could result in a promotion to a leadership position or gaining entry into the Latin Kings (for probationary members).  On Long Island, Latin Kings members are frequently involved in violent altercations with members of rival gangs, such as the Crips and Southside Posse ("SSP").  Long Island Latin Kings members have carried out shootings targeting members of rival gangs and others.  Latin Kings members also commit crimes to make money for the gang through, for instance, robberies and the sale and distribution of narcotics.

C.  **The Investigation of the Huntington Division
of the Latin Kings**

    1.  **The Confidential Source**

        8.  A confidential source ("CS"), who has been a member
of the Latin Kings on Long Island for approximately ten (10)
years and who is currently a member of the Huntington division,
has been working with the FBI Task Force for more than four
years.  The information provided by the CS during that time has
repeatedly been truthful and reliable.  Since approximately 2006,
the CS has recorded division meetings, Universals, telephone
calls and other conversations involving Latin Kings members.
Additionally, Task Force members have conducted surveillance of
several Latin Kings meetings and transactions between the CS and
other members of the Latin Kings.

    2.  **Violence Advocated at Latin Kings Meetings**

        9.  Common themes of discussion at Latin Kings
meetings include discipline of members and instilling respect and
fear of the Latin Kings in others, including rival gang members,
through acts of violence.  For instance, on or about August 22,
2007, four Third Crowns and their Pearls (assistants to the Third
Crown) of several Long Island Latin Kings divisions, including
Huntington, met in Nassau County, New York to discuss Latin King
business, including the importance of communication between the
Third Crowns of the Long Island divisions.  As the First Crown
for all of Long Island, defendant ANGEL CORDERO, JR., also known

as "King Epic," led the meeting, which was consensually recorded by the CS.  During the meeting, CORDERO stated that although there was currently no Third Crown for all of Long Island, he and "King Illis" were available to help any division.  During the meeting, a Latin King member stated that he would rather "handle stuff" himself so that his Latin King brothers would have an "alibi."  Based on my training and experience and my knowledge of this investigation, including my discussions with the CS, I believe that during this portion of the meeting, the Latin Kings, including CORDERO, discussed committing acts of violence and how to evade detection by law enforcement.

10.  On or about August 23, 2009, defendant ANGEL CORDERO, JR., also known as "King Epic," led a meeting of the Huntington division, which took place in Bay Shore, New York. This meeting was recorded.  CORDERO, who was the First Crown of the Huntington Latin Kings at that time, directed members to "ride with each other" to sell drugs and to ensure that the name of the Latin Kings is enforced and respected.  CORDERO advocated the use of violence against anyone who disrespected the Latin Kings and encouraged members to instill fear of the Latin Kings in others.  Defendants JOSE SOSA, also known as "King Sosa," LUIS LEMUS, also known as "King Scar," and EDWIN MOREJON, also known as "King Drama," were among those who attended the meeting on or about August 23, 2009.

3.   <u>Shootings and Other Plans for Violence</u>

   a.   <u>The July 30, 2009 Shooting of Victim #1</u>

   11.   On or about July 30, 2009, an individual whose
identity is known to law enforcement (Victim #1), was shot in the
leg in the vicinity of Craven Street and 11th Avenue in
Huntington Station, New York.   In a statement provided to law
enforcement by one of the individuals who participated in the
shooting, s/he stated, in sum and substance, that the four
individuals in the white vehicle on Craven Street from which
shots emanated, were defendants LUIS LEMUS, also know as "King
Scar," JOSE SOSA, also known as "King Sosa," JEREMIAH BOWENS,
also known as "King Ghost," and JONATHAN DIAZ.  The participant
further stated that, as the white vehicle approached two black
males who were standing on the side of the street, SOSA stuck his
body outside the car window and LEMUS held a gun outside the
vehicle and fired five to ten shots.

   12.   On or about August 4, 2009, the defendant JOSE
SOSA, also known as "King Sosa," admitted to the CS that he
participated in the shooting of a member of the Southside Posse
("SSP"), a rival street gang, and that the SSP member was shot in
the leg.

   13.   On or about September 14, 2009, at the direction
of and under the supervision of the FBI Task Force, the CS
purchased a Hi Point 9mm carbine, Model 995, serial no. B93828

from defendants ANGEL CORDERO, JR., also known as "King Epic,"
and JOSE SOSA, also known as "King Sosa," for $400.[2/]   Ballistic
analysis of a shell casing recovered from the July 30, 2009
shooting of Victim #1 on Craven Street revealed that it was fired
from the 9mm carbine purchased by the CW on September 14, 2009.

> **b.   The September 1, 2009 Shooting of Victim #2**

14.   On or about September 1, 2009, a victim whose
identity is known to law enforcement (Victim #2), was shot in the
abdomen and right arm by the defendant LUIS LEMUS, also known as
"King Scar."   The shooting occurred in the vicinity of Tower
Street and Lowndes Avenue in Huntington Station, New York, near
the Jack Abrams Intermediate School.   Eye witnesses identified
LEMUS as having been in an altercation with two black males
shortly before the shooting.

15.   On or about September 7, 2009, the defendant LUIS
LEMUS, also known as "King Scar," told the CS, in sum and
substance, that he recently was in an argument with two SSP
members outside a laundromat on Lowndes Avenue.   LEMUS further
admitted that after the argument, he returned to his home,
retrieved a .357 Magnum revolver, and returned to the laundromat,

---

[2/] Although the conversations leading up to the gun purchase took
place between the CS and CORDERO, CORDERO directed the CS to pick
up SOSA prior to the gun deal.   SOSA then directed the CS to a
house, where SOSA retrieved the 9mm carbine and provided it to
the CS in exchange for $400.

where he shot at two black males, who LEMUS recognized as associates of the two SSP members.

16.  On or about September 8, 2009, the CS purchased two firearms, a .357 Smith & Wesson revolver, bearing serial no. 572-87481, and .380 Hi Point, Model CG380, semi-automatic pistol, bearing serial no. P786773, from the defendant ANGEL CORDERO, JR., also known as "King Epic."  The CS paid CORDERO $750 for both firearms, which CORDERO and defendant JEREMIAH BOWENS, also known as "King Ghost," retrieved from the home of defendant JENNIFER SABATINO, located on East 11st Street in Huntington Station, New York.

17.  Ballistics analysis revealed that the .357 Smith & Wesson revolver purchased by the CS on or about September 9, 2009 matched the bullet removed from Victim #2's arm.

18.  Moreover, on or about September 17, 2009, the Suffolk County Police Department ("SCPD") arrested the defendant LUIS LEMUS at the residence of a Brentwood division Latin Kings member for the shooting of Victim #2.  LEMUS had been temporarily residing at this location to avoid detection by law enforcement. In post-arrest statements, LEMUS admitted that he shot at two black males.

c.  <u>Attempted Retaliation for Slashing of "Puppet"</u>

19.  On or about September 13, 2009, the CS met with other members of the Latin Kings, including defendants ANGEL

CORDERO, JR., also known as "King Epic," and JEREMIAH BOWENS, also known as "King Ghost." The CS was informed by fellow Latin Kings members that Scal Mazara, also known as "King Puppet," had been slashed in the face by members of the Crips street gang in Wyandanch. The CS reported that CORDERO stated, in sum and substance, that he wanted to kill two Crips in retaliation for the slashing of Mazara. The CS further informed agents that members of the Huntington division displayed guns that night and that BOWENS held up a gun to demonstrate how he was going to shoot the Crips.

20. According to the CS, he and several other members of the Huntington division, including defendants ANGEL CORDERO, JR., also known as "King Epic," and JEREMIAH BOWENS, also known as "King Ghost," drove through Wyandanch and Huntington in two separate cars looking for Crips to shoot. Although the Latin Kings found no Crips to shoot that night, CORDERO told the members of the Huntington division that they must be available twenty-four hours per day in case they are needed to fight with the Crips.

21. The following day, on or about September 14, 2009, the CS spoke by telephone to defendants LUIS LEMUS, also known as "King Scar," and JOSE SOSA, also known as "King Sosa." During the consensually-recorded conversations, the CS discussed with

both LEMUS and SOSA, in separate calls, the anticipated

retaliation against the Crips for slashing "King Puppet."

      d.   **The October 18, 2009 Shooting of Victim #3**

      22.  On or about October 18, 2009, Victim #3, whose

identity is known to law enforcement, was shot in the leg on

Tenth Avenue in Huntington Station.  An eyewitness, whose

identity is known to law enforcement officers, reported that a

black truck drove past Victim #3 and a male individual ("MI-1")

who was with Victim #3, and ███████ a Juvenile Co-Conspirator ████████

████████ yelled "Amor del Rey" out the window.  The

eyewitness further advised officers that this phrase is a Latin

Kings phrase and that MI-1 yelled back: "A.D.R. [Amor del Rey] my

dick!"

      23.  According to the eye witness, at that point, the

black truck stopped and ████ the Juvenile Co-Conspirator ████

████████ got out of the truck holding a gun, which he

pointed at MI-1 and fired a number of times.  MI-1 fled; the Juvenile

Co-Conspirator continued to shoot at Victim #3.

      24.  On or about December 4, 2009, the defendant EDWIN

MOREJON, also known as "King Drama," a member of the Huntington

Latin Kings division, told the CS, in sum and substance, that the

████████ the Juvenile Co-Conspirator ████████ shot the guy on

10th Street.  During the same conversation, MOREJON advised the

CS that he had a 9mm gun to sell to the CS.

25.  On or about December 10, 2009, the CS purchased a 9mm semi-automatic Smith & Wesson model 5906 pistol, which firearm had a defaced serial number, for $600 from the defendant EDWIN MOREJON, also known as "King Drama."  The gun transaction, as well as telephone calls with MOREJON leading up to the gun transaction, were recorded by the CS.  During the gun transaction, MOREJON states that the gun is "dirty."  Based on my training and experience and my knowledge of this investigation, including my discussions with the CS, I believe that by "dirty," MOREJON meant that the gun had been used in a shooting.

26.  Ballistic analysis revealed that the 9mm semi-automatic Smith & Wesson model 5906 pistol purchased by the CS from MOREJON matched the 9mm shell casings recovered from the shooting of Victim #3.

27.  The CS reported that ███████ the Juvenile Co-Conspirator ████████████████████████ is a probationary member of the Huntington division and has attended Latin Kings meetings.  On or about March 22, 2010, Task Force officers photographed the Juvenile Co-Conspirator at a Latin Kings gathering in Belmont Park in West Babylon, New York.

28.  The ████████ Juvenile Co-Conspirator ███ ███████ ███████ was charged in Suffolk County in or about October 2009 for burglary in the second degree, along with a co-defendant,

whose identity is known to the affiant and who is known to be a member of the Huntington division of the Latin Kings.

###### e.   Attempted Retaliation on December 21-22, 2009

29.   On or about December 21-22, 2009, the CS recorded a series of telephone calls with the defendant JOSE SOSA, also known as "King Sosa," and other Huntington division Latin Kings pertaining to SOSA's intent to commit a drive-by shooting of a rival Crip member.  SOSA solicited the CS's help, requesting that the CS drive SOSA to a location where he intended to shoot a rival Crip gang member.  SOSA was arrested by the SCPD that night at a Taco Bell restaurant parking lot in Huntington Station, while he waited in a car with others, including defendant JEREMIAH BOWENS, also known as "King Ghost," for the CW.  While no firearms were found in the car, SCPD officers recovered a dagger from SOSA.  BOWENS and another individual in the vehicle had black bandanas, which, based on my training and experience and my knowledge of this investigation, I know are commonly used as masks in shootings and are referred to as their "flag."

#### D.   Firearms Trafficking by CORDERO, BOWENS, SOSA AND SABATINO

30.   As discussed above in paragraph 16, on or about September 8, 2009, the CS purchased two firearms, a .357 Smith & Wesson revolver, bearing serial no. 572-87481, and .380 Hi Point, model CG380, semi-automatic pistol, bearing serial no. P786773, from the defendant ANGEL CORDERO, JR., also known as "King Epic."

The CS paid CORDERO $750 for both firearms, which CORDERO and defendant JEREMIAH BOWENS, also known as "King Ghost," retrieved from the home of defendant JENNIFER SABATINO, located on East 11st Street in Huntington Station, New York.

31.   During conversations related to purchasing the firearms, the CS told CORDERO, in sum and substance, that the CS was going to sell the firearms to another individual, who would send the firearms to El Salvador.

32.   Soon after arriving at the defendant JENNIFER SABATINO'S residence on or about September 8, 2009 with the CS and BOWENS, CORDERO called SABATINO, who was not yet at the residence.   The CS was wearing a recording device.   CORDERO and BOWENS were searching SABATINO's residence for the firearms as they spoke to SABATINO over the telephone.   CORDERO asked SABATINO, "where exactly did you leave it?"   BOWENS later advised SABATINO: "Alright, we've got it, we'll call you back."   The recording reveals that BOWENS then stated to CORDERO: "she's going to be here in a moment, she's outside."   Moments later, SABATINO entered the residence.

33.   The CS advised that CORDERO and the CS conducted the transaction in a bathroom at SABATINO's residence.   During the transaction, CORDERO advised the CS that he had three other guns he wanted to sell, including two rifles.   After the CS paid

CORDERO $750, CORDERO left the bathroom and asked SABATINO for a bag, as well as some socks or a shirt, to conceal the firearms. The recording reveals that at one point, SABATINO's young child was approaching and SABATINO stated to CORDERO: "Here he comes, so put it away."

34.  After the transaction, the CS turned over the two firearms to Task Force members, who were conducting surveillance in the vicinity of SABATINO's residence while the CS was inside.

35.  On or about September 14, 2009, CORDERO agreed to sell the CS a 9mm firearm for $400.  Telephone conversations between the CS and CORDERO, as well as defendant SCAL MAZARA, also known as "King Puppet" and "Pup," revealed that CORDERO and MAZARA were at SABATINO's residence.[3/]  As discussed earlier, in paragraph 13, later that day, CORDERO directed the CS to pick up the defendant JOSE SOSA, also known as "King Sosa."  SOSA then directed the CS to SABATINO's residence.  Before entering the residence, SOSA called CORDERO with the CS to ask whether the CS should pay SOSA.  CORDERO advised SOSA to take the money from the CS.  SOSA then retrieved the 9mm Hi Point carbine, model 995, bearing serial no. B93828, and ammunition from SABATINO's residence while the CS waited in his car.  SOSA returned to the car with the firearm and ammunition, which he provided to the CS.

---

[3/] Based on recorded conversations with the CS, as well as other evidence, it appears that MAZARA kept personal belongings, such as clothing, at SABATINO's residence.

36.  Shortly after the firearm purchase, the CS met members of the FBI Task Force, who were doing surveillance of the area surrounding SABATINO's residence, and turned over the 9mm Hi Point carbine, model 995, bearing serial no. B93828, and ammunition.

37.  On or about October 1, 2009, CORDERO sold the CS a defaced .380 caliber semi-automatic Bersa Thunder pistol in exchange for $400 in the parking lot of a Carvel ice cream store in Deer Park, New York.  During the firearm transaction, CORDERO and the CS discussed how much CORDERO would charge the CS for heroin.  Shortly after the meeting, the CS met with Task Force members and turned over the defaced .380 caliber semi-automatic Bersa Thunder pistol.

38.  On or about March 21, 2010, the CS purchased a 9mm Hi Point, model C9, semi-automatic pistol, bearing serial no. P148559, from the defendant SCAL MAZARA, also known as "King Puppet" and "Pup," in exchange for $550.  A review of criminal history records reveals that on or about March 1, 2007, MAZARA was convicted in Suffolk County of Attempted Robbery in the Second Degree, a Class D Felony.  MAZARA was sentenced to five years' probation.

39.  Through consultation with an interstate nexus expert of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), I learned that all of the firearms discussed above,

21

which were purchased by the CS, were manufactured outside the State of New York and thus, had to travel in interstate or foreign commerce to enter the State of New York.  I have further been informed that records checks by ATF personnel revealed that defendants CORDERO, SOSA, BOWENS and SABATINO are not licensed importers, manufacturers or dealers in firearms.

WHEREFORE, your deponent respectfully requests that arrest warrants issue for the defendants ANGEL CORDERO, JR., also known as "King Epic," JOSE SOSA, also known as "King Sosa," JEREMIAH BOWENS, also known as "King Ghost," LUIS LEMUS, also known as "King Scar," JONATHAN DIAZ, ████████████████ ██████████ SCAL MAZARA, also known as "King Puppet" or "Pup," EDWIN MOREJON, also known as "King Drama," and JENNIFER SABATINO so that they may be dealt with according to law.

WHEREFORE, your deponent further respectfully requests that, given the nature of this application, that this affidavit and the arrest warrants be filed under seal until further order of the Court.

_____
JOHN M. TRIOLO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
24th day of March 2010

E. THOMAS BOYLE, MJ
THE HONORABLE E. THOMAS BOYLE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK